# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CHARTIS SPECIALTY INSURANCE COMPANY,<br>an Illinois Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 12-CV-1207-RDR-JPO |
| vs. | ) ) | |
| ENVIRONMENTAL RISK SOLUTIONS, LLC;<br>GREG MARSHALL;<br>NEX-TECH AEROSPACE HOLDINGS, INC.;<br>NEX-TECH PROCESSING, INC.;<br>NEX-TECH MACHINING, INC.;<br>THAYER AEROSPACE CONSOLIDATED LLC;<br>THAYER AEROSPACE HOLDING CO., LLC;<br>THAYER AEROSPACE PLATING, INC., | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR DAMAGES, RESTITUTION, INJUNCTIVE RELIEF, AND DECLARATORY RELIEF

COMES NOW the Plaintiff, Chartis Specialty Insurance Company ("Chartis Specialty"), and in support of its Complaint for Damages, Restitution, and Injunctive and Declaratory Relief states:

## NATURE OF THE ACTION

1. This is an action for:

- a declaratory judgment to determine the rights and responsibilities of the parties under an insurance policy (the "Policy"), No. CCC 2673128, issued by plaintiff ("Chartis Specialty") to the predecessor in interest of Environmental Risk Solutions, LLC ("ERS"), the first defendant named herein;

- damages and restitution against ERS and its principal, defendant Greg Marshall ("Marshall") on account of their misappropriation of funds entrusted to their care by plaintiff; and

- injunctive relief to prevent the ongoing misappropriation.

-2-

2.     As more fully set forth below, the Policy is a "Clean-Up Cost Cap" policy that, subject to the terms and conditions thereof, provides coverage for remediation of certain groundwater contamination emanating from the site known as the "West Street Area Sites" in Wichita, Kansas, which include what is known as the Air Capitol Plating site.  A copy of the Policy is annexed to this Complaint at Tab 1 and made a part hereof for all purposes.

### PARTIES, JURISDICTION, AND VENUE

3.     Chartis Specialty, the plaintiff, is an Illinois corporation with its principal place of business in New York.  It operates as an insurance company on a "non-admitted," or "surplus lines," basis.  It was formerly known as American International Specialty Lines Insurance Company.

4.     Defendant ERS is a Delaware limited liability company.  All of the members of ERS of whose existence plaintiff is aware are citizens of states other than New York and Illinois.  None of the members of ERS of whose existence plaintiff is aware is a citizen of Illinois or New York and, on information and belief, no member of ERS is such a citizen.

5.     On information and belief, defendant Marshall is the Chief Executive Officer and Chief Operating Officer of ERS and he is a citizen of Ohio.

6.     Defendant Nex-Tech Aerospace Holdings, Inc. is a Delaware corporation with its principal place of business at 4201 South 119th Street West, Wichita, KS 67215-9100.

7.     Defendant Nex-Tech Processing, Inc. is a Delaware corporation with its principal place of business at 4201 South 119th Street West, Wichita, KS 67215-9100.

8.     Defendant Nex-Tech Machining, Inc. is a Delaware corporation with its principal place of business at 4201 South 119th Street West, Wichita, KS 67215-9100.

-3-

9.    Defendants Thayer Aerospace Consolidated LLC; Thayer Aerospace Holding Co., LLC; and Thayer Aerospace Plating, Inc. are, on information and belief, enterprises that are defunct and/or have been merged into one or more of the Nex-Tech defendants.  The Thayer entities are sued herein because they are named in the Policy, but it is believed that they do not have existence separate from the Nex-Tech entities.

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because the plaintiff is a citizen of Illinois and New York, each of the defendants is a citizen of a state but not of New York or Illinois, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.    Venue is proper in this district under, *inter alia*, 28 U.S.C. § 1391(a)(2), because a substantial part of the events giving rise to the claims occurred in Wichita, KS and the property that is the subject of the Policy is located here.

## BACKGROUND

### *The Policy*

12.    The Policy is one of "Clean-Up Costs Cap Insurance" that, in general terms and subject always to the specific terms and conditions of the Policy, provides the insured(s) with coverage against the possibility that cleaning up identified sources of pollution may be more expensive than anticipated.  It was issued as of December 31, 1998, and it has a "Policy Termination Date" of January 4, 2035.

13.    The Policy was originally issued to Cherokee Thayer, LLC, of Englewood, Colorado, with certain Additional Insureds (on information and belief, financing parties) as listed on Endorsement No. 2 thereof.  The "Covered Location" was described in the Declarations as:

> West Street Area Sites
> 1702 Knight Street
> Wichita, KS

-4-

Subject to all its terms and conditions, including without limitation specific scope limitations set forth in Endorsement No. 19, the Policy provided coverage for certain cleanup activities at the Covered Location pursuant to a certain "Environmental Risk Assumption Agreement" between Cherokee Thayer and Thayer Aerospace Holding Co., LLC. (the "ERAA"). The principal activities involved monitoring and characterizing, for potential remediation, a plume of Trichloroethylene ("TCE") asserted by the Kansas Department of Health and the Environment ("KDHE") to be emanating from the Air Capitol Plating Site (one of the West Street Area Sites).

14. The owners and/or operators of the Covered Location were named as additional Named Insureds in Endorsement No. 1, as follows:

> Thayer Aerospace Consolidated LLC
> Thayer Aerospace Holding Company LLC
> Thayer Aerospace Plating Company, Inc.

but only for liability that both arises out of their operations at the Covered Locations *and* is liability that Cherokee Thayer assumed in the ERAA. In other words (and again in general terms), Cherokee Thayer agreed in the ERAA to clean up the Covered Locations on behalf of the owners/operators thereof, and the Policy both insured certain costs of its doing so and provided certain coverage, as defined therein, for the owners/operators in respect of third-party claims on the liabilities that Cherokee Thayer had agreed to assume.

15. Following the inception of the Policy, Cherokee Thayer, LLC was, on information and belief, merged into defendant Environmental Risk Solutions, LLC ("ERS"), and Defendant ERS assumed and succeeded to the rights and obligations of Cherokee Thayer under the ERAA and under the Policy.

***The Early Years of the Clean-Up***

16. The work at the Site was governed by a February 1, 2000 consent order (the "Consent Order") between Cherokee Thayer and the KDHE in Case No. 99-E-0208. The Con-

sent Order provided for a Comprehensive Investigation/Corrective Action Study (CI/CAS) to define and characterize the TCE plume and propose remedial measures.

17.    In 2004, a Corrective Action Study was submitted that focused on, among other things, the potential responsibility for the TCE plume of sources other than the Air Capitol Plating site.  KDHE asserted, however, that the Air Capitol Plating site may not simply have been downgradient from the original source but may have had its own source contributing to the plume, and it pressed for additional characterization and monitoring work.

18.    In 2005, certain residential landowners downgradient from the Site showed elevated TCE levels in their wells.  The Consent Order was modified to require Cherokee Thayer to install whole-house treatment systems at these properties pending building of a water pipeline from the City of Wichita municipal water supply to service the residences.

19.    In 2006 and 2007 a dispute arose between Chartis Specialty and ERS about the interpretation of the provision of Endorsement 8 of the Policy that "Losses paid by the Company will not exceed 70% of the total remediation costs incurred for the Covered Location."  In 2008, as set forth in more detail below, that dispute was resolved as to past invoices by a lump-sum payment by Chartis Specialty to ERS that was less than the amount ERS demanded and more than Chartis Specialty believed was due.

### ERS Is Insolvent

20.    Because, as set forth further below, ERS is insolvent, has no capital resources whatsoever, and can only operate hand-to-mouth, work on the site languished for a period of time in 2008.  Late in the year, KDHE began pressing for further action.

21.    Very little happened in 2009, because ERS did not have the funds or the personnel to move forward.  In late 2008, in connection with a proceeding under another policy regarding a site in Florida, a principal of ERS admitted that the company was then insolvent.

-6-

22.    On information and belief, ERS remains insolvent.

23.    In several meetings in 2010 and 2011, defendant Marshall, at the time and currently a principal of ERS, stated the following:

- ERS has no personnel, no capital, and no resources.
- ERS's only assets are its interests in various "commutation accounts" established under clean-up insurance policies for various sites, in which ERS is entitled to receive leftover funds if the clean-ups ultimately cost less than the amounts in the commutation accounts.
- ERS is not under the control of its owners but rather of secured lenders, who are no longer advancing funds.

24.    During the course of 2011, Chartis Specialty came to believe — and thereafter, shortly before the filing of this action, confirmed — that ERS had misappropriated to itself during 2008 funds it had earlier received from Chartis Specialty in payment of third-party vendor invoices.  Specifically, Allied Environmental Services ("Allied") claimed, and ERS agreed, that a number of invoices had not been paid, notwithstanding that ERS had submitted those invoices to Chartis Specialty for payment under the Policy and had in fact received such payment from Chartis Specialty.  This diversion to itself of funds received for pass-through to a vendor is further evidence that ERS is insolvent, does not have sufficient (or, indeed, any) operating capital, and is always in the position of robbing Peter to pay Paul.

**The "Agreement in Principle"**

25.    Throughout 2009 and 2010, KDHE was pressing for further characterization work on the TCE plume, potentially leading to remedial measures.

26.    In October 2010, KDHE specifically threatened enforcement proceedings against ERS if work did not resume.

27.    Because ERS had no money and work on the Air Capitol Plating site was at a standstill, Chartis Specialty then reached agreement with ERS that Chartis Specialty would pre-

-7-

fund an account to be controlled by ERS (but subject to specific terms and conditions) to enable

ERS to carry on the necessary investigative measures at the site.  A copy of the agreement is an-

nexed hereto at Tab 2 and made a part hereof for all purposes.

28.     The agreement annexed at Tab 2 is denominated an "Agreement in Principle,"

but it is in fact a binding contract because the condition precedent to effectiveness that it sets

forth has in fact taken place, in that KDHE stated that enforcement proceedings would be sus-

pended to give ERS the opportunity to resume work.

29.     The subject of Agreement in Principle is an "Assessment" of work to be done

at the Air Capitol Plating Site, and the Agreement in Principle provides in relevant part:

>     1. [Chartis Specialty] will deposit $750,000 into an interest-bearing ac-
> count (the "Account") at a bank to be designated by ERS.  The account will be in
> the name of ERS and will be controlled solely by ERS, to be used at ERS's dis-
> cretion subject to the terms of this AIP.
>
>     2. The Assessment shall be treated as "Cleanup" under and subject to the
> terms of the Policy, including without limitation Section V thereof, and [Chartis
> Specialty]'s deposit of funds into the Account shall be treated as payment of a
> claim for "Cleanup Costs."  ERS shall periodically submit proof of payment to
> [Chartis Specialty], including copies of the invoices against which the amounts
> expended were paid.
>
>     3. Funds in the Account will be used solely for costs incurred after the
> date of this AIP for negotiation and completion of the Assessment — *i.e.*, the
> comprehensive investigation and corrective action study referred to in the letter
> dated September 21, 2010 from Paul Marx, Esq. to Greg Marshall (the "KDHE
> Letter") and required by the State of Kansas for the Thayer Aerospace West Street
> Area Sites location, at 1702 Knight St., Wichita, Kansas, and adjoining areas.
> "Costs of negotiation," as used here, includes expenses, including travel costs,
> and reasonable hourly charges for the time incurred by Greg Marshall in arrang-
> ing, negotiating, and overseeing the Assessment, and for reasonable hourly charg-
> es of such legal and other counsel as ERS may elect to retain to represent ERS in
> connection with this matter.  [Chartis Specialty] acknowledges that David Bell,
> Esq., of Cleveland Heights, Ohio, and Willis of Ohio, Inc. have been retained as
> legal and/or other counsel by ERS.

30.     On or about November 9, 2010, Chartis Specialty paid to ERS the $750,000

provided for under the Agreement in Principle (the "AiP Fund"), to be used solely for the pur-

poses therein provided.

-8-

31.    Section V of the Policy, expressly referred to and incorporated in the Agreement in Principle, provides in relevant part:

### V.    RIGHTS OF THE COMPANY AND DUTIES OF THE INSURED IN CONNECTION WITH REMEDIAL ACTIVITIES

1.    The Company shall have the right but not the duty to review, assess and inspect all aspects of any **Cleanup** to which the policy applies, regardless of whether the **Insured** has incurred **Cleanup Costs** in excess of the **Self-Insured Retention**.  Neither the Company's rights nor its exercise of its rights under this paragraph shall constitute an undertaking to determine or warrant that the **Cleanup** is safe, healthful, or in conformity with applicable law.

2.    The **Insured** shall take all reasonable and prudent steps to minimize the **Cleanup Costs**.  The **Insured** shall limit access to the **Covered Location** and prevent the spread of further contamination.

3.    The **Insured** shall retain competent professional(s) or contractor(s) acceptable to the Company and the **Insured** to undertake and complete **Cleanup**.

4.    The **Insured** shall report discovery of **Pollutants** at or beyond the boundaries of the **Covered Location** to, and all notice hereunder shall be reported to:

> Steven Lessick
> Attorney at Law
> P.O. Box 295
> Jersey City, NJ 07303

or such other address as the Company may designate.

    a.    The **Insured** shall keep detailed records of all **Cleanup Costs**.

    b.    To the extent of the **Insured**'s legal right of access, the **Insured** shall permit the Company to inspect the **Covered Location**, as often as the Company chooses after providing reasonable notice, and inspect all financial records, drawings, plans and specifications involved in the **Loss**.

    c.    The **Insured** shall cooperate with the Company by providing the Company with:

        (i)    All information developed or discovered by the **Insured** concerning the **Cleanup**, whether or not deemed by the **Insured** to be relevant;

        (ii)    Free access to interview any agent, servant or employee of the **Insured** or any contractor or subcontractor involved in the **Cleanup**;

        (iii)    Any other information or other responses to reasonable requests from the Company concerning the **Cleanup**.

-9-

32.   Effective February 1, 2011, following agreement with ERS through its broker, Chartis Specialty issued Endorsement 24 to the Policy, which provides in relevant part:

1.   A Cost Cap Additional Insured scheduled below shall become the **Named Insured** only in the event the Cost Cap Additional Insured becomes responsible for the execution of the **Remedial Action Plan** due to the occurrence of any of the following:

. . .

   b)   Insolvency or the voluntary or involuntary bankruptcy of **Named Insured** listed in Item 1. of the Declarations resulting in the inability of the **Named Insured** to execute the **Remedial Action Plan**

. . . .

2.   In the event any of the foregoing is satisfied and a Cost Cap Additional Insured becomes **Named Insured**:

   a)   The Cost Cap Additional Insured first listed below shall become the **Named Insured**, or another Cost Cap Additional Insured agreed upon by the Company and all Cost Cap Additional Insureds scheduled below shall become the **Named Insured**.

   b)   The Cost Cap Additional Insured who becomes the **Named Insured** shall assume all the responsibilities of the **Named Insured** including, but not limited to, providing **Cleanup Costs** and **Remedial Action Plan** progress reports, reporting the discovery of new Pollutants, or increases in the concentration or disbursement of known **Pollutants**, responsibility for the **Self-Insured Retention** and applicable **Co-Insurance Participation**, responsibility for receipt and acceptance of endorsements to the Policy and giving and receiving notice of cancellation.

   c)   The Company shall have the right but not duty to perform, manage or undertake **Cleanup** and the right to approve any contractor involved in the execution of the **Remedial Action Plan**. Any sums expended in taking such action by the Company will be deemed incurred or expended by the **Insured** and shall be applied against the limits of coverage and **Self-Insured Retention** under this Policy. Nothing done by the Company in executing its rights shall result in liability in excess of the Limits of Liability stated in Item 4. of the Declarations.

. . . .

   **Cost Cap Additional Insured(s)**

      Nex-Tech Aerospace Holdings, Inc.
      Nex-Tech Processing, Inc.
      Nex-Tech Machining, Inc.
      Thayer Aerospace Consolidated LLC
      Thayer Aerospace Holding Company, LLC
      Thayer Aerospace Plating, Inc.

-10-

33.    Endorsement 24 was delivered to ERS and received by it without objection.  It is part of the Policy for all purposes.

***ERS's Ongoing Breaches of the Agreement
in Principle and the Policy***

34.    ERS's record of performance — or, more precisely, lack of performance — under the Policy and the Agreement in Principle throughout 2011 and into 2012 has been abysmal.  ERS has repeatedly missed promised deadlines to KDHE for planning and work on the Assessment.

35.    Almost from the first moment the Agreement in Principle was entered into, ERS has breached its reporting conditions and, as well, has breached the parallel provisions of Section V of the Policy.

36.    ERS was months late in getting out the Requests for Proposal to do the site evaluation, and further months late in doing the evaluation.

37.    ERS, through Greg Marshall, repeatedly stated that it did not have the time or resources to manage the project itself, but needed to hire it done (using the funds provided by the Agreement in Principle).

38.    When Chartis Specialty entered into the Agreement in Principle in October 2010, it acknowledged that Willis of Ohio, Inc. ("Willis"), an insurance broker, had been retained by ERS as an adviser.

39.    On March 29, 2011 ERS paid $37,500 to Willis.  The Agreement in Principle authorized payment of such advisers for "reasonable hourly charges."  The size of the payment to Willis, the round dollar amount, and the timing all plainly indicate that the payment was a retainer fee, paid in advance against work yet to be done, rather than payment of hourly charges for work that been done prior to the date of payment.

-11-

40.    Willis resigned as an adviser to ERS in the summer of 2011.  Chartis Specialty has seen no indication that ERS ever obtained, or sought, from Willis replenishment for the benefit of the AiP Fund for any amounts in excess of the reasonable hourly charges actually earned by Willis prior to its resignation.

41.    Throughout 2011, ERS refused — notwithstanding repeated requests by Chartis Specialty — even to provide an accounting of the expenditures from the AiP Fund pursuant to the Agreement in Principle, let alone provide the backup it was required to supply pursuant to the Agreement in Principle and Section V of the Policy.

42.    Finally, in December 2011, ERS provided a one-page spreadsheet of expenditures from the AiP Fund, but still no backup.  As set forth below, that spreadsheet was materially false and misleading and constituted an effort by defendants ERS and Marshall to conceal their ongoing misappropriation of funds.

43.    Until March 12, 2012, backup for the expenditures had *still* not been provided, notwithstanding repeated demands therefor.  Finally, on March 12, 2012, ERS provided through its counsel a portion of the requested backup.

44.    The backup as provided is seriously incomplete.  For example, there are invoices with no corresponding listed payments and listed payments with no corresponding invoices.  So too, the bank statements from the account into which the AiP Fund was deposited were entirely absent and were not provided until April 17, 2012.

45.    Incomplete as it is, however, the backup and the now-provided bank statements confirm that, as set forth in more detail below, Marshall has repeatedly and on an ongoing basis been misappropriating for his personal benefit funds entrusted to him and ERS pursuant to the Agreement in Principle.

-12-

46.     The bank statements further confirm that ERS has also misappropriated to its own benefit funds from the AiP Fund.

47.     Throughout 2011, ERS's excuse for not complying with the documentation requirements was that Mr. Marshall could not afford to work on ERS matters and was doing other things.  Notwithstanding that assertion — which, if true, is simply further demonstration that ERS's insolvency is preventing it from performing under the Policy — Mr. Marshall was paying himself at the rate of $10,000 per month in the latter part of 2011, all without providing the required backup to Chartis Specialty.  In fact, that monthly payment is completely fraudulent.  Marshall is doing nothing like the amount of work reflected on his invoices "supporting" the payments, and he is simply treating the funds entrusted to him as a slush fund for his benefit.

*Defendant Marshall's Misappropriation*

48.     Defendant Marshall has misappropriated to himself a portion of the funds entrusted to him under the Agreement in Principle.  In particular, he has been paying himself from the AiP Fund for work he plainly did not do, and he has been doing so against fraudulent made-to-order "invoices."

49.     On each of September 9, 2011, November 8, 2011, and November 30, 2011, defendant Marshall caused checks to be issued to himself from the AiP Fund in the amount of $10,000.

50.     The September 9 check (#1013 from account #1110007624 at United Bank & Trust) was issued against nothing more than a September 6 e-mail from Mr. Marshall to the Plymouth Management Company, which is apparently a company he had retained to provide administrative services.  The November 8 and November 30 checks (##1017, 1023) were issued against no contemporaneous documentation at all.

-13-

51.     The September 6 e-mail simply states that "My [*i.e.*, defendant Marshall's] time is calculated at 40 hours x $250.00 or $10,000.00." It provides no further backup, time records, or breakdown.

52.     The round number amount and the complete lack of backup would be indicators of fraud even if it were likely (which it is not) that Marshall actually spent 40 hours on Project work in July and August 2011.

53.     By way of contrast, ReSolution Partners, the company that ERS hired to supervise the Assessment because Marshall was "too busy" to do so, spent a total of 3 hours in July 2011 and 2.5 hours in August 2011 on project management work. It is simply inconceivable that Marshall spent 40 hours on the project in the same time period; the e-mail "invoice" is false on its face.

54.     The September 6 e-mail, addressed to Dana Sutton (the management company employee who cuts the checks) goes on to say, "Dana please include 40 hours of your time at your billing rate." This provides corroboration of both falseness and fraudulent intent, since it cannot be that *Marshall* is telling *Dana* how much time *Dana* actually spent.

55.     Marshall's telling Dana how much time she should bill for was a recurrent practice.

- On January 12, 2011, Marshall told Dana to bill for 15 hours, the same amount of time he was billing for.
- On March 7, 2011, Marshall told Dana to bill for 20 hours, the same amount of time he was billing for.
- On May 31, 2011, Marshall told Dana to bill for 20 hours, the same amount of time he was billing for.

There is not the slightest indication that Dana actually spent the amounts of time indicated. There is no backup and there are no time records, notwithstanding that companies in the business of supplying office administrative services routinely maintain detailed time records and supply

-14-

them to their customers.  The facts set forth above compel the conclusion that the following checks to Plymouth Management were, at the very least, fraudulently inflated:

- #1004, dated March 11, 2011, in the amount of $1,250.
- #1010, dated June 2, 2011, in the amount of $1,300.
- #1014, dated September 9, 2011, in the amount of $2,500.

56.    As set forth above, Marshall caused at least two other $10,000 checks to be issued to him, on November 8, 2011 and November 30, 2011.  There is no contemporaneous backup for those checks at all.

57.    The only "backup" supplied for those two checks is a pair of "invoices" that were fabricated on March 9, 2012 (that is the date they bear).  That date is the Friday before the Monday on which ERS's counsel finally delivered the "backup" to counsel for Chartis Specialty.

58.    Copies of these two "invoices" — "Invoice #0001" and "Invoice #0002" — are annexed hereto at Tab 3.  Each of these "invoices" is in the round-number amount of $10,000 and states (without further backup or explanation) that it is for "40 HOURS @ $250.00HR." The invoices were apparently concocted in such haste that Mr. Marshall badly misspelled the name of his own company, rendering it as "Enviormental Risk Soulitions."  The inference is inescapable that Marshall was told by his counsel that Chartis Specialty was pressing for backup and he had better come up with some, so Marshall did just that.

59.    Marshall's misappropriation of funds continues unabated.  Although the Agreement in Principle authorizes ERS to pay Marshall only his reasonable hourly charges for time actually expended, Marshall has continued to cause ERS to pay him $10,000 a month for work (if any) that is worth substantially less than that.  The bank statements provided on April 17, 2012 reveal the following additional $10,000 payments to Marshall:

-15-

| Date | Check No. | Amount |
|------|-----------|--------|
| January 3, 2012 | 1031 | $10,000 |
| February 1, 2012 | 1032 | $10,000 |
| February 28, 2012 | 1035 | $10,000 |

60.    In addition, the bank statements reveal that Marshall lied to Chartis Specialty on December 13, 2011 when he asserted in an e-mail that he was providing Chartis Specialty "an excel spread sheet detailing all payments made from the trust account to date."   Among other things, the spreadsheet does not contain any mention of the following payments, all of which took place before the date of the e-mail:

- An August 22, 2011 wire transfer of $65,000 from the AiP Fund directly to ERS's own money-market account
- An October 11, 2011 transfer of $5,060 from the AiP Fund directly to Plymouth Management
- A November 10, 2011 transfer of $5,060 from the AiP Fund directly to Plymouth Management

61.    On information and belief, Marshall knew that the spreadsheet was materially false and misleading when he supplied it, and he supplied it with the specific intent that it would dissuade Chartis Specialty from making further inquiries so that Marshall could continue looting the AiP Fund to his own personal benefit.

***ERS's Earlier Misappropriation of Funds***

62.    Marshall's misappropriation of funds from the AiP Fund is of a piece with a misappropriation by ERS in 2008.

63.    During 2007 and early 2008, as a result of its interpretation of the provision of Endorsement 8 of the Policy that "Losses paid by the Company will not exceed 70 percemt of the total remediation costs incurred for the Covered Location," Chartis Specialty was paying invoices submitted by ERS at the rate of 70 cents on the dollar.

-16-

64.     Certain of the invoices submitted for payment by ERS included invoices from Allied for work it was doing.  Those invoices were paid by Chartis Specialty at 70 cents on the dollar.

65.     Because ERS was then (and remains) insolvent, it was initially unable to pay Allied the remainder of its invoices.

66.     Thereafter, ERS and Chartis Specialty came to an agreement to resolve the 70 percent issue, and in February 2008 Chartis Specialty made a lump-sum additional payment to ERS of $45,000 in full and final settlement of the dispute as to the level of payment (70 percent or 100 percent).

67.     Notwithstanding that ERS had now received funds with which to pay its vendors — and, in fact, had received those funds on the basis of vendor invoices it had submitted to Chartis Specialty — it did *not* turn around and pay its vendors the amounts it owed.  Instead, it retained the funds for its own purposes, leaving the vendors unpaid and unwilling to do additional work until the old invoices had been cleared.

68.     The original unpaid amount of the Allied invoices was $15,122.82.  No part of that amount was paid to Allied until at least August 2011.  Instead, ERS retained those funds for its own purposes.

***ERS's 2011 Misappropriation of Funds from the
AiP Fund To Cover Up Its 2008 Misappropriation***

69.     In the Spring of 2011, ERS and Marshall asserted to Chartis Specialty that Chartis Specialty should pay the overdue Allied invoices, because Allied was declining to proceed with any work in 2011 until the overdue invoices were cleared.  ERS said that if Chartis Specialty did not pay the invoices itself, ERS would pay them from the AiP Fund.

-17-

70.   In response, Chartis Specialty investigated and determined that, as set forth above, it had already paid ERS for these invoices and that it was therefore ERS's responsibility to pay the invoices from its own funds.

71.   On May 26, 2011, counsel for Chartis Specialty wrote to counsel for Marshall and ERS stating that it was ERS's responsibility to pay the Allied invoices from its own funds and, in addition, specifically rejecting the possibility that the invoices could be paid from the AiP Fund.  A copy of this letter is annexed hereto at Tab 4.

72.   Nevertheless, on August 5, 2011, ERS caused $65,500 to be transferred from the investment account within the AiP Fund to the checking account within the AiP Fund and, on August 22, caused $65,000 to be transferred from that checking account to ERS's own money market account, which is *not* within the AiP Fund.  On information and belief, ERS thereafter used a portion of the $65,000 to pay the overdue Allied invoices and retained the rest for its own purposes.

73.   ERS's transfer of the $65,000 to its own money market account constitutes misappropriation, as does its use of a portion of those funds to pay the old Allied invoices.  It also constitutes a breach of the express provision of the Agreement in Principle that the AiP Fund was to be used "solely for costs incurred after the date of this AIP for negotiation and completion of the Assessment."

74.   The misappropriation was compounded and concealed by Marshall's lie about it on December 13, 2011, when he deliberately omitted from the spreadsheet that purportedly identified "all payments made from the trust account to date" any reference either to the $65,000 transfer or to the payment of the Allied invoices.

-18-

### FIRST CLAIM FOR RELIEF
### (Restitution Pursuant to K.S.A. §§ 40-2,118 and 40-2,118A)
### (Against Defendants Marshall and ERS)

75.   Chartis Specialty repeats and realleges paragraphs 1 to 74 above.

76.   The presentation to Chartis Specialty by Marshall and ERS, through their counsel, of the false and fraudulent "invoices" described above constituted presentation to Chartis of knowingly and materially false written information for the purpose of obtaining insurance claim payments — *i.e.*, payments from the AiP Fund.

77.   Such presentation was undertaken by Marshall and ERS knowingly and with specific intent to defraud and thus is a "fraudulent insurance act" within the meaning of K.S.A. 40-2,118 (as to conduct before May 19, 2011) and K.S.A. 40-2,118a (as to conduct on and after May 19, 2011).

78.   Pursuant to subsection (f) of K.S.A. 40-2,118 and K.S.A. 40-2,118a, Chartis Specialty is entitled to restitution from ERS and Marshall of all funds so misappropriated.

### SECOND CLAIM FOR RELIEF
### (Damages and Restitution for Fraud and Misappropriation)
### (Against Defendants Marshall and ERS)

79.   Chartis Specialty repeats and realleges paragraphs 1 to 74 above.

80.   The AiP Fund was entrusted to ERS for the sole purpose of paying "for costs incurred after the date of [the] AIP for negotiation and completion of the Assessment."

81.   Defendant Marshall converted those funds to his own use when he caused them to be paid to himself for work he had not performed, based on wholly fictitious and fabricated "invoices."

-19-

82.   Defendant Marshall is a principal of defendant ERS and was enabled to convert the funds solely by reason of his position as such.  Accordingly, defendant ERS is also liable to Chartis Specialty for Marshall's misconduct.

83.   Chartis Specialty is entitled to an accounting from defendants Marshall and ERS for the funds converted and misappropriated, for restitution of such funds, and for damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Damages for Breach of Contract)
### (Against Defendant ERS Only)

84.   Chartis Specialty repeats and realleges paragraphs 1 to 74 above.

85.   ERS has breached the Agreement in Principle by permitting the AiP Fund to be used as Marshall's personal slush fund, rather than "solely for costs incurred after the date of [the] AIP for negotiation and completion of the Assessment."

86.   ERS has also breached the Agreement in Principal by taking for itself $65,000 for purposes other than those permitted by the Agreement in Principle.

87.   ERS is liable to Chartis Specialty on account of such breach for damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### (Injunctive Relief)
### (Against Defendants Marshall and ERS)

88.   Chartis Specialty repeats and realleges paragraphs 1 to 74 above.

89.   Unless restrained, defendants ERS and Marshall will continue to misappropriate the AiP Fund for Marshall's personal benefit.

90.   There is no adequate remedy at law for such continued misappropriations.

-20-

91.     Chartis Specialty is entitled to preliminary and permanent injunctive relief preventing ERS and Marshall from exercising any further dominion and control over the AiP Fund and returning the AiP Fund to Chartis Specialty.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Judgment)
### (Against All Defendants)

92.     Chartis Specialty repeats and realleges paragraphs 1 to 74 above.

93.     There is an actual controversy between Chartis Specialty and ERS concerning the parties' rights and obligations under the Policy and the Agreement in Principle.

94.     Chartis Specialty believes that ERS is in ongoing breach of the Policy and Agreement in Principle for failure to provide records.  ERS apparently disagrees (or, at least, failed for over a year to provide the requested records).

95.     Chartis Specialty believes that ERS's insolvency has prevented it from performing properly under the Policy.  ERS apparently disagrees.

96.     Chartis Specialty believes that ERS and Marshall have misappropriated funds from the AiP Fund, as alleged above.  On information and belief, ERS disagrees.

97.     Chartis Specialty believes that ERS may have improperly paid Allied Environmental Services on old invoices (or adjusted the price for current work to account for such outstanding invoices) with funds from the Agreement in Principle.  On information and belief, ERS disagrees.

98.     The Nex-Tech and Thayer defendants are made parties to this claim because they are the "Cost Cap Additional Insureds" under Endorsement 24 and will either lose their contingent coverage under the Policy or, at the least, become the Named Insureds if the relief Chartis Specialty seeks herein is granted.

-21-

99.     Section VII.1.b of the Policy provides that the Policy may be cancelled by Chartis Specialty in the event of "material fraud or misrepresentation by the Insured."

100.    Chartis Specialty is entitled to a declaration that:

(a)     ERS has breached the Policy and the Agreement in Principle through failure to provide records;

(b)     ERS has breached the Policy and the Agreement in Principle through misappropriation of funds;

(c)     ERS is insolvent;

(d)     ERS's insolvency is preventing it from performing under the Policy;

(e)     Chartis Specialty is entitled to cancel the Policy pursuant to Clause VII.1.b by reason of the material fraud and misappropriation of defendants ERS and Marshall;

(f)     In the alternative, and solely in the event that cancellation is for some reason held to be unavailable, then the conditions for Endorsement 24 have been triggered, ERS's interest in the Policy has been terminated, Nex-Tech Aerospace Holdings, Inc. is now the Named Insured under the Policy, and the remaining Nex-Tech and Thayer defendants are now the Insureds under the Policy; and

(g)     ERS is obligated to account to Chartis Specialty, in full and in detail, for expenditures under the Agreement in Principle, to return to Chartis Specialty the remaining balance of the funds provided under the Agreement in Principle, and to repay to Chartis Specialty any funds determined in the accounting to have been improperly expended.

-22-

WHEREFORE, CHARTIS SPECIALTY demands judgment against the defendants for:

(a)  Restitution, in an amount in excess of $100,000, under the First Claim for Relief;

(b)  Damages, in an amount in excess of $100,000, under the Second and Third Claims for Relief;

(c)  Preliminary and Permanent Injunctive Relief, as set forth in the Fourth Claim for Relief;

(d)  The declaration set forth in paragraph 100 of the Fifth Claim for Relief; and

(e)  For costs and for such other and further relief as to the Court may seem just and proper.

Dated:   Wichita, Kansas
         June 8, 2012

                                        HITE, FANNING & HONEYMAN LLP


                                        By: /s/ Arthur Chalmers_____
                                        Arthur Chalmers (# 11083)
                                        Bradley J. LaForge (# 20323)
                                        100 North Broadway
                                        Suite 950
                                        Wichita, Kansas 67202-2209
                                        Telephone (316) 265-7741
                                        Facsimile (316) 267-7803
                                        chalmers@hitefanning.com
*Of Counsel:*                           laforge@hitefanning.com

    Edward P. Krugman
    CAHILL GORDON & REINDEL LLP
    80 Pine Street
    New York, New York 10005
    Telephone (212) 701-3000
    Facsimile (212) 378-2233
    ekrugman@cahill.com